2 ct

**McKISSOCK & HOFFMAN, P.C.**
By:   B. Craig Black, Esquire
I.D.   #36818
By:   Robert A. McDermott, Esquire
I.D.   #66724
2040 LINGLESTOWN ROAD
SUITE 302
HARRISBURG, PA  17110
(717) 540-3400

ATTORNEYS FOR DEFENDANTS
DAVID J. SALINGER, M.D. and KEYSTONE
ONCOLOGY, LLC

| | |
|---|---|
| AMANDA BARGE and ARTHUR BARGE<br>Plaintiffs<br><br>v.<br><br>DAVID J. SALINGER, M.D., WILLIAM YING,<br>PH.D.,  KEYSTONE ONCOLOGY, LLC,<br>COMPREHENSIVE PHYSICS AND<br>REGULATORY SERVICES, LTD. and<br>EQUIMED, INCORPORATED<br>Defendants | IN THE UNITED STATES DISTRICT COURT<br>FOR THE MIDDLE DISTRICT OF<br>PENNSYLVANIA<br><br>NO.  1:CV-00-1881<br><br>JUDGE CONNER<br><br>JURY TRIAL DEMANDED |

FILED
HARRISBURG, PA
MAR 1 0 2003
MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

### BRIEF OF DEFENDANT KEYSTONE ONCOLOGY, LLC, TO DISMISS PLAINTIFF'S CLAIM ASSERTING VICARIOUS LIABILITY FOR THE NEGLIGENCE OF DEFENDANT WILLIAM YING

Defendant, Keystone Oncology, LLC, respectfully requests that this Honorable Court Dismiss the following Counts and/or paragraphs from Plaintiffs' Amended Complaint, with prejudice:

Paragraph 4 in regard to the allegation that Defendant Ying was employed by Keystone Oncology;

Count II – Paragraphs 28 and 30;

Count III – Paragraph 31 insofar as it incorporates by reference paragraphs 1 through 30 and the allegations that Defendant Ying was the agent, servant or employee of Defendant Keystone Oncology;

Count IV – paragraphs 36 and 37 insofar as they allege that Defendant Ying and "other agents, servants and/or employees of … Keystone were involved with the inspection, testing" etc of "the machine";

Count VII – In its entirety;

Count VIII – In its entirety insofar as it incorporates previous Counts and paragraphs.

## SUMMARY STATEMENT OF UNDERLYING FACTS

Plaintiff Amanda Barge was diagnosed with a recurrent basal cell carcinoma on her right upper lip.  After trying other methods of treatment for earlier occurrences of the cancer, Plaintiff was referred to the Heritage Hills Oncology Center and Dr. Salinger for radiation therapy.  Approximately one month prior to Mrs. Barge's treatment, the Oncology Center had acquired a used superficial radiation unit which would be used in the irradiation of Plaintiff's cancer.  The machine was calibrated for use by Defendant, William Ying, Ph.D.   Dr. Ying produced pre-prepared dosage calculation forms for Dr. Salinger to use in determining the correct amount of time to reach the desired output for each radiation therapy session up to the dose prescribed of the entire treatment.

Plaintiff contends that she started noticing changes to her lip immediately following the first treatment.  Dr. Salinger's does not recall and did not record in Mrs. Barge's treatment notes any alarming changes consistent with the Plaintiff's recollections.  After Mrs. Barge received about ten (10) treatments it was determined that she was receiving doses of radiation higher than Dr. Salinger had prescribed.  Subsequent testing of the unit indicated that the amount of radiation may have been as much as 5 times greater than what was initially believed.

## STATEMENT OF FACTS CONCERNING THE INSTANT MOTION

Plaintiff filed an amended Complaint on or about May 3, 2001 that sets forth, *inter alia,* the assertion that Defendant William Ying was the agent or servant of Defendant Keystone Oncology.  See  Plaintiffs' Amended Complaint at Paragraph 4, Count II paragraphs 28 and 30, Count IV paragraphs 36 and 37, and Count VII, attached as Exhibit "A".

Defendant William Ying has been deposed in connection with this case.  At his deposition taken on December 19, 2001 Defendant Ying testified that he was employed by

CPRS (Defendant Comprehensive Physics and Regulatory Services, Ltd.), and he thought that was the case in April, 1999.  He specifically denied that he was employed by "Keystone".  <u>See</u> Deposition testimony of Defendant Ying  at page 19:8 to 20:21 attached as Exhibit "B".

One of the witnesses deposed in this case, Abdurrahman Unal, M.D., explained in his deposition the role of Keystone Oncology.  He also explained that there was a professional corporation called Central PA Radiation Oncology, PC that had a role.  Central PA Radiation Oncology was responsible for providing the physicians to the practice.  Keystone Oncology provided the technical component.  Keystone Oncology was responsible for contracting with a physicist to provide those services.  <u>See</u> Deposition testimony of Abdurrahman Unal at 7:19 to 8:25 attached as Exhibit "C".

Consistent with Dr. Unal's testimony is the "Technical Services Agreement" entered into between Keystone Oncology, LLC and Comprehensive Physics and Regulatory Services, LTD.  A copy of that agreement is attached as Exhibit "D".  It is set forth in the agreement  that Comprehensive Physics and Regulatory Services, LTD (referred to as "contractor" in the agreement) would provide "comprehensive physics services as reasonably may be requested by the treatment center [Keystone Oncology and its treatment facilities] including but not limited to physics coverage (including high dose rate and seed implant coverage), required dosimetry services, radiation therapy equipment and facility related licensure and/or inspection (state, federal and/or otherwise), and oversight of maintenance of the radiation oncology equipment of the treatment center, annual calibration and/or acceptance testing of all radiation oncology equipment."  <u>See</u> Exhibit "D" at page 1 section 2 (A).  The contract further spells out that both the treatment center and the contractor are to be considered "independent contractors" and that they "shall each be solely responsible for its own respective actions."  <u>See</u> Exhibit "D", at page 3, section 3.

Pursuant to the Technical Services Agreement attached as Exhibit "D" Comprehensive Physics and Regulatory Services, LTD installed the superficial X-ray unit at issue in this case and performed the calibration and acceptance testing.  See service reports 7686-001 and 9407-0299 attached hereto as Exhibit "E".  Dr. Ying testified at his deposition that he provided the acceptance testing for the superficial unit installed in April of 1990 at Heritage Hills after it was installed by the "service department" of CPRS.  See deposition testimony of William Ying at page 35:9 to 35:25 attached hereto as Exhibit "F".

Keystone Oncology d/b/a Heritage Hills Radiation Oncology Center did not hold out William Ying to be their employee to the Plaintiff's Amanda and Arthur Barge.  As a matter of fact, both Amanda Barge and Arthur Barge testified that they never met Dr. Ying (See copy of the testimony of Amanda Barge at page 96 and of the Plaintiff Arthur Barge at pages 75-76 attached as Exhibit "G" and "H" respectively).

It is clear from the foregoing that Keystone Oncology did not employ William Ying, but rather entered into an independent contractor relationship with Defendant, Comprehensive Physics and Regulatory Services, LTD, who was the employer of the Defendant William Ying. Further, the Plaintiffs did not interact with William Ying so they could not have believed him to be an employee of Keystone Oncology.

**LEGAL ARGUMENT**

### APPLICATION OF PENNSYLVANIA LAW

A federal court sitting in diversity jurisdiction shall apply the substantive law of the state with the most significant contact to the proceeding.  Erie Railroad v. Tompkins,. 304 U.S. 64, *cert denied*, 305 U.S. 639 (1938).

Accordingly, since the tort actions alleged in Plaintiffs' Complaint occurred in Pennsylvania and the time of the alleged tortuous action Defendants all resided in Pennsylvania, this Honorable Court should apply the substantive law of the Commonwealth of Pennsylvania in the adjudication of this matter.

### AGENCY/ RESPONDEAT SUPERIOR/ VICARIOUS LIABILITY

In Rohrbach v. AT&T Nassau Metals Corp., 1994 U.S. Dist. LEXIS 14468___ F. Supp. ___, (1994)[1] the Honorable James F. McClure, Jr. explained the factors to be considered in determining the relationship of parties to determine in if a claim for *Respondeat Superior* is proper:

> In Pennsylvania, a principal may be held liable for the torts of an agent when an employer/employee (or "master/servant") relationship exists between the two.  ...the factors to be considered in determining whether such a relationship exists are said to include: "the control of the manner that work is to be done; responsibility for result only; *terms of agreement between the parties; the nature of the work or occupation; the skill required for performance; whether one employed is engaged in a distinct occupation or business;...  In this analysis the key element is extent of control by the employer or master.*"

> Rohrbach  at page 4 (citations omitted, emphasis added).

When applying the facts of this matter to the factors cited by Judge McClure, it is clear that there is not a proper relationship to hold Keystone Oncology liable for the actions of William Ying.  Keystone Oncology is in business to provide medical services to patients with various

---

[1] A copy of the opinion is attached as Exhibit "I" for the Court's convenience.

cancers.  They do not have their own physicists on staff.  Therefore, they entered into a contractual agreement with Comprehensive Physics and Regulatory, LTD. (William Ying's employer)  to provide the physicist support services needed at the oncology centers that were run by Keystone.  Keystone did not control the work of William Ying.  William Ying reported to CPRS.  The agreement between the parties clearly states that CPRS is providing "comprehensive physics services" at Keystone Oncology's treatment centers.  It further spells out that they are to be considered an independent contractor from Keystone.  Certainly, acting as a physicist is a "distinct occupation" from a radiation oncologist.  A physicist is providing specialized detailed professional services that are relied upon by the medical professionals treating their patients.  The physicist is responsible for the result of his work.

In Pennsylvania a party is not normally responsible for the negligence of an independent contractor.  "In general, a principal incurs no respondeat superior liability for the torts of independent contractors." Davis V. Hoffman, 972 F. Supp. 308, 312 (ED.Pa 1997).  "The very phrase "independent contractor" implies that the contractor is independent in the manner of doing the work contracted for.  How can the other party control the contractor who is engaged to do the work and who presumably knows more about doing it than the man who, by contract, authorized him to do it?  Responsibility goes with authority." Sylvius v. Grossman, 307 Pa. 272, 278, 161 A. 362 (1932).

There is an exception to the general rule that when an employee is an independent contractor may be liable, and that is where the work that is being done would entail "a peculiar risk" or a "special danger" Mentzer v. Ognibene, 408 Pa. Super. 578,597 A.2d 604, 610 (Pa. Super. 1991), allocater denied 609 A.2d 168 (Pa.1992).  As pointed out by Judge McClure in Rohrbach it is a limited exception.  In order to trigger the exception to the general rule "the risk of harm must arise from the peculiar or inherent nature of the task of the manner or performance and not the ordinary negligence which might attend the performance of any task." Rohrbach at  5.  Here, there is no contention that there was a peculiar or inherent danger in the work provided by William Ying.  William Ying is a physicist who holds a PhD.  He was hired to perform physics services by Comprehensive Physics and Regulatory Services, LTD, and then in turn provided those services on behalf of Comprehensive to Keystone through the contractual agreement entered into by Keystone Oncology and Comprehensive Physics.  Thus, the limited exception to the general rule that one who employs a general contractor is not liable for their torts would not be triggered here.

Based on the foregoing, there is clearly no employer/employee relationship between the Defendant, Keystone Oncology and William Ying, and it is clear that Keystone Oncology entered into an independent contractor agreement from the provision of physics services at its radiation oncology centers.  In that there is no contention that the general rule that one who employs a independent contractor is not liable for the torts of an independent contractor, Plaintiff's claims for vicarious liability against Keystone Oncology arising out of the alleged negligence of William Ying must fail.

WHEREFORE, Defendant, Keystone Oncology, respectfully requests that this honorable court dismiss all references in Plaintiff's amended complaint that make a claim for liability on the part of Keystone Oncology for the alleged negligence of William Ying, as specifically enumerated above, with prejudice and in favor of Keystone Oncology.

Respectfully submitted,

McKissock & Hoffman, P.C.

B. Craig Black, Esquire
Attorney I.D. No. 36818
Robert A. McDermott, Esquire
Attorney I.D. No. 66724
2040 Linglestown Road; Suite 302
Harrisburg, PA 17110
(717) 540-3400

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AMANDA BARGE                              *
3100 Coachman Way
Manchester, Maryland 21102                *

and                                       *

ARTHUR BARGE                              *   NO. 1:00-CV-1881
3100 Coachman Way
Manchester, Maryland 21102,               *

      Plaintiffs                   *

v.                                        *   CIVIL ACTION - LAW

DAVID J. SALINGER, M.D.                   *
Hershey Medical Center
500 University Park Drive                 *
Hershey, Pennsylvania 17033
                                          *   JURY TRIAL DEMANDED
and                                       
                                          *
WILLIAM YING, Ph.D.
1200 Dunsinane Hill                       *
Chester Springs, Pennsylvania 19425-1309
                                          *
and                                       
                                          *
KEYSTONE ONCOLOGY, LLC
d/b/a HERITAGE HILLS ONCOLOGY CTR.  *
119 South Burrowes Street, Suite 505
State College, Pennsylvania 16801         *

and                                       *

COMPREHENSIVE PHYSICS AND                 *
REGULATORY SERVICES, LTD.
1200 Dunsinane Hill                       *
Chester Springs, Pennsylvania 19425-1309
                                          *
and                                       
                                          *

1

EQUIMED, INCORPORATED
1200 Dunsinane Hill                              *
Chester Springs, Pennsylvania  19425-1309,
                                                *
     Defendants
                                                *

                     *************************

## AMENDED COMPLAINT

COME NOW the Plaintiffs, AMANDA BARGE and ARTHUR BARGE, by their

attorneys, Richard Oare and Louis G. Close, III, and sue DAVID J. SALINGER, M.D.,

WILLIAM YING, Ph.D., KEYSTONE ONCOLOGY, LLC d/b/a HERITAGE HILLS

ONCOLOGY CENTER, COMPREHENSIVE PHYSICS AND REGULATORY SERVICES,

LTD., and EQUIMED, INCORPORATED, Defendants, and state as follows:

### JURISDICTION AND VENUE

1.      The United States District Court for the Middle District of Pennsylvania has

jurisdiction over this matter by virtue of 28 USC Section 1332(a)(1) wherein the District Courts

have been given original jurisdiction of all civil actions where the matter in controversy exceeds

the sum or value of $50,000.00, exclusive of interest and costs, and is between citizens of

different states.

2.      The Plaintiffs Amanda Barge and Arthur Barge are domiciled in the State of

Maryland and reside at 3100 Coachman Way, Manchester, Maryland.

3.      The Defendant David J. Salinger, M.D. is licensed in the Commonwealth of

Pennsylvania with his principal place of business at 500 University Park Drive, Hershey,

Pennsylvania.

2

4.      The Defendant William Ying, Ph.D., upon information and belief, is a medical physicist employed with the Defendants Comprehensive Physics and Regulatory Services, Ltd.; Equimed, Inc.; and/or the Defendant Keystone Oncology, LLC.

5.      The Defendant Keystone Oncology, LLC, upon information and belief, is incorporated in the Commonwealth of Pennsylvania, and does substantial business in Pennsylvania, including but not limited to, the operation of Heritage Hills Oncology Center, located at 41 South Columbus Avenue, Littlestown, Pennsylvania.

6.      The Defendant Comprehensive Physics and Regulatory Services, Ltd., upon information and belief, is a Virginia company doing substantial business in the Commonwealth of Pennsylvania, with an office located at 1200 Dunsinane Hill, Chester Springs, Pennsylvania.

7.      The Defendant Equimed, Inc., upon information and belief, is a Pennsylvania company whose corporate offices are located at 21 Sandy Drive, State College, Pennsylvania 30084-5637 and 1200 Dunsinane Hill, Chester Springs, Pennsylvania 19425-1309 (the same address as the Defendant Comprehensive Physics and Regulatory Services, Ltd.).

8.      This is a negligence claim wherein it is alleged that the Defendants were negligent regarding the inspection, testing, evaluation, and calibration of a superficial x-ray machine, and were negligent regarding the administration of radiation therapy to the Plaintiff Amanda Barge, causing injury and damage to the Plaintiffs. Such conduct at issue in this matter occurred in Littlestown, Pennsylvania. Jurisdiction is conferred upon this Honorable Court pursuant to U.S.C. §28-1332.

3

## COUNT I

### Amanda Barge v. David J. Salinger, M.D.,
### Keystone Oncology, LLC and William Ying, Ph.D.

#### Negligence

9.    At all times of which the Plaintiff complains, the Defendant David J. Salinger, M.D. represented to the Plaintiff and the public that he possessed the degree of skill, knowledge, and ability possessed by reasonably competent medical practitioners, practicing under the same or similar circumstances as those involving the Plaintiff.

10.    The Plaintiff alleges that the Defendant Salinger owed to the Plaintiff the duty to exercise the degree of care, skill and judgment expected of a competent medical practitioner acting in the same or similar circumstances, which duty included the performance of adequate and proper diagnostic tests and procedures to determine the nature and severity of the Plaintiff's condition, careful diagnosis of such condition, employment of appropriate procedures, surgery and/or treatment to correct such conditions without injury upon the Plaintiff, continuous evaluation of the Plaintiff's condition and the effects of such treatment, and adjustment of the course of treatment in response to such ongoing surveillance and evaluation – all of which the Defendant failed to do.

11.    The Defendant was negligent in that he failed to employ appropriate treatment, surgery and/or tests, failed to carefully and thoroughly evaluate the Plaintiff's condition, failed to properly and appropriately diagnose the Plaintiff's condition, failed to thoroughly evaluate the effects and results of any tests and/or procedures performed, failed to properly evaluate the effects of chosen treatment, failed to adjust the Plaintiff's treatment in response to appropriate evaluation of the effects of treatment, failed to properly monitor the course of the Plaintiff's

4

condition and treatment, failed to employ adequate and proper diagnostic procedures and/or tests to determine the nature and extent of the Plaintiff's condition.

12.    As a direct and proximate result of the negligence of the Defendant, the Plaintiff Amanda Barge has suffered unending physical pain, emotional anguish, scarring and disfigurement, fear, as well as anxiety over her condition, as is more fully described herein-below, for which claim is made.

13.    At all times of which the Plaintiff complains, the Defendant William Ying, Ph.D. represented to the Plaintiff and the public that he possessed the degree of skill, knowledge, and ability possessed by reasonably competent medical physicists, practicing under the same or similar circumstances as those involving the Plaintiff.

14.    The Plaintiff alleges that the Defendant Ying owed to the Plaintiff the duty to exercise the degree of skill, care, and judgment expected of a competent medical physicist acting in the same or similar circumstances, which duty included the performance of adequate and proper diagnostic tests, procedures, and calibrations of the used/refurbished x-ray machine in order to render such equipment safe for patient treatment; employment of appropriate procedures and/or calibrations to provide radiation therapy to the Plaintiff without injury upon the Plaintiff; continuous evaluation of the Plaintiff's condition, and the effects of such treatment, and adjustment of the course of treatment in response to such ongoing surveillance and evaluation – all of which the Defendant failed to do.

15.    The Defendant was negligent in that he failed to employ appropriate treatment, tests, calibrations and/or procedures, failed to carefully and thoroughly evaluate the Plaintiff's condition, failed to thoroughly evaluate the effects and results of any tests and/or procedures

5

performed, failed to properly evaluate the effects of chosen treatment, failed to adjust the Plaintiff's treatment in response to appropriate evaluation of the effects of treatment, failed to properly monitor the course of the Plaintiff's condition and treatment.

16.    As a direct and proximate result of the negligence of the Defendant, the Plaintiff Amanda Barge has suffered unending physical pain, emotional anguish, scarring and disfigurement, fear, as well as anxiety over her condition, as is more fully described herein-below, for which claim is made.

17.    On or about May 24, 1999, the Plaintiff Amanda Barge presented to the Defendant Salinger for treatment of a basal cell anomaly to the right upper lip. The Defendants Salinger and Ying determined the dosage and treatment regimen to be administered to the Plaintiff Amanda Barge, and commenced with radiation treatment to the right upper lip area, using the recently installed, used/refurbished, superficial x-ray machine. From the time of the initial treatment on May 24, 1999 through the time that the Defendants Salinger and Ying ceased with such treatment, the Plaintiff Amanda Barge made complaints to the Defendants regarding the extreme pain and burning sensation to the skin in the area of the radiation therapy, after each and every treatment.

18.    It is asserted that the Defendant Ying negligently failed to properly calculate and/or calibrate the used/refurbished machine, such that excessively high amounts of radiation was administered to the Plaintiff Amanda Barge. Further, contrary to the standards of care, the Defendant Salinger and others at the Defendant Keystone Oncology , LLC continued to administer such excessive radiation over a period of two and a half weeks, despite the Plaintiff Amanda Barge's complaints with regard to these burning symptoms. During this time, the

6

Plaintiff Amanda Barge was constantly reassured by the Defendant Salinger and others employed by the Defendant Keystone Oncology, LLC that her symptoms of pain, burning and discoloration were normal and to be expected.

19.    Finally, after repeated and continuous complaints of pain, swelling, induration, and blistering on both the skin and mucosal areas of the Plaintiff Amanda Barge's face, the Defendants Salinger, Ying, and Keystone Oncology, LLC belatedly ceased with radiation treatments, and ascertained that the dosages and/or intensity of radiation being administered to the Plaintiff was in extreme excess of that which was prescribed and thought to have been administered.  The Defendants belatedly determined that the Plaintiff Amanda Barge was administered with radiation multiple times the amount that was prescribed and recommended for her.

20.    As a direct and proximate result of the negligence of the Defendants, and each of them, in allowing the radiation to be negligently administered in an amount approximately five times that which was safe and appropriate, the Plaintiff Amanda Barge sustained severe, permanent, full- thickness radiation burns in the area of the right upper lip and face.

21.    The Plaintiff alleges that had the Defendants, and each of them, conformed with applicable standards of care, the excessive radiation that the Plaintiff was negligently administered would not have occurred.  Further, had the Defendants complied with the standards of care, the excessive radiation that was negligently allowed to be given, would have been immediately recognized, in a timely manner, and the treatments and/or the machine would have been properly adjusted, such that permanent burning, scarring, and disfigurement would have been avoided.  Further, had the Defendants, and each of them, complied with the applicable

7

standards of care, the Plaintiff Amanda Barge would not have been required to undergo

debridement and excision of dead tissue through a surgical procedure in August, 1999, nor would

she have been required to undergo skin grafting surgery in August of 1999 as well. Further, had

the Defendants complied with the applicable standards of care and properly and adequately

monitored the radiation therapy being administered to her, the Plaintiff Amanda Barge would not

have been required to undergo additional surgery in March, 2000 including scar revision surgery,

in an effort to minimize the significant scarring and disfigurement that the Plaintiff sustained as a

result of the negligent over-radiation by the Defendants Salinger, Ying, and Keystone Oncology,

LLC. The Plaintiff Amanda Barge will require yet another additional surgery in the future in

order to reconstruct the scarred area of the face and lip which was negligently allowed to occur.

     22.     As a direct and proximate result of the Defendants' negligence, the Plaintiff has in

the past, is presently, and will in the future continue to suffer unending physical pain, emotional

anguish, fear, and anxiety over her condition; she has lost her former state of emotional and

physical well-being; and has been unable to engage in and/or resume her normal activities,

including employment, for an extensive period of time.

     23.     It is further alleged that the Plaintiff has in the past, is presently, and will in the

future incur significant hospital, surgical, physiotherapeutic, pharmacological, custodial, and

other losses and expenses for which claim is made.

     24.     The Plaintiff refers to the negligence of the Defendants Salinger, Ying, and

Keystone Oncology, LLC as the sole and proximate cause of all of the injuries, damages, and

disabilities sustained – with the Plaintiff being in no way contributorily negligent.

8

WHEREFORE, the Plaintiff Amanda Barge demands judgment against the Defendants David J. Salinger, M.D., William Ying, Ph.D, and Keystone Oncology, LLC, jointly and severally in the sum of One Million Dollars ($1,000,000.00).

## COUNT II

### Amanda Barge v. Keystone Oncology, LLC

### Negligence – Respondeat Superior

25.    The Plaintiff incorporates in this Count those facts as set forth in Count I hereinabove by reference thereto intending that each and every allegation hereinabove be deemed part hereof as if the same were repeated herein.

26.    Keystone Oncology, LLC is a professional corporation, incorporated in the Commonwealth of Pennsylvania, involved, among other things, in the business of providing medical oncology services to patients.  This Defendant owns and/or operates an oncology treatment center named Heritage Hills Oncology Center, located at 41 South Columbus Avenue, Littlestown, Pennsylvania  17340.

27.    At all times relevant hereto, the Defendant David J. Salinger, M.D. was acting individually and as the agent, servant and/or employee of Defendant Keystone Oncology, LLC, doing business as Heritage Hills Oncology Center.

28.    At all times relevant hereto, the Defendant William Ying, Ph.D. was acting individually and as the agent, servant and/or employee of Defendant Keystone Oncology, LLC, doing business as Heritage Hills Oncology Center.

9

29.    The Defendant David J. Salinger, M.D. committed acts and/or omissions within the scope of his employment with the Defendant Keystone Oncology, LLC, causing injuries and damages to the Plaintiff as aforesaid.

30.    The Defendant William Ying, Ph.D. committed acts and/or omissions within the scope of his employment with the Defendant Keystone Oncology, LLC, causing injuries and damages to the Plaintiff as aforesaid.

WHEREFORE, the Plaintiff Amanda Barge demands judgment against the Defendant Keystone Oncology, LLC in the sum of One Million Dollars ($1,000,000.00).

## COUNT III

### Amanda Barge and Arthur Barge v. David J. Salinger, M.D., William Ying, Ph.D. and Keystone Oncology, LLC

### Loss of Consortium

31.    The Plaintiffs incorporate in this Count those facts set forth in Count I hereinabove by reference thereto intending that each and every allegation hereinabove be deemed part hereof as if the same were repeated herein.

32.    The Plaintiffs allege that they are husband and wife.  As the result of the negligence of the Defendants, the Plaintiffs assert that their marriage and marital relationship was interrupted and continues to be interrupted.

33.    The severe, unrelenting pain, from which the Plaintiff Amanda Barge suffers as well as the permanent scarring and disfigurement sustained as a result of the negligence of the Defendants, has permanently interrupted and damaged the Plaintiffs' marriage and the Plaintiff Amanda Barge's ability to function as a normal wife.

10

34.    By reason of the injuries to Plaintiff Amanda Barge, Plaintiff Arthur Barge has suffered great mental anguish by being forced to witness the suffering endured by his wife, whereby his own nerves and health have been seriously and permanently shocked, weakened, and impaired, and by reason of the physical and mental condition of his wife, Plaintiff's husband still continues to suffer in mind and body, and has been denied the care, protection, consideration, companionship, aid, and society of his wife, and the pleasure and assistance of his wife in maintaining their household.

WHEREFORE, Plaintiffs Amanda Barge and Arthur Barge demand judgment against the Defendants David J. Salinger, M.D., William Ying, Ph.D., and Keystone Oncology, LLC, jointly and severally, for the loss of consortium, in the amount of Five Hundred Thousand Dollars ($500,000.00).

## COUNT IV

**Amanda Barge v. William Ying, Ph.D., Equimed, Inc.,
Comprehensive Physics and Regulatory Services, Ltd., and Keystone Oncology, LLC**

### Negligence

35.    On or about April 26, 1999, the Defendant Equimed Corporation (hereinafter "Equimed") and the Defendant Comprehensive Physics and Regulatory Services, Ltd. (hereinafter "CPRS"), delivered and installed a used/refurbished superficial x-ray machine to the Heritage Hills Oncology Center, a facility owned and/or operated by the Defendant Keystone Oncology, LLC.  It was this machine that was used for providing radiation therapy to the Plaintiff Amanda Barge.

11

36.    It is asserted that at the time that this machine was provided by the Defendants CPRS and Equimed to the Defendant Keystone Oncology, LLC (hereinafter "Keystone"), the Defendant Ying as well as other agents, servants, and/or employees of the Defendants CPRS, Equimed, and Keystone were involved with the inspection, testing, and initial commissioning of the machine in order to ensure that it was appropriate for use in the treatment of patients.

37.    It is asserted that the Defendants Ying, Equimed, CPRS, and Keystone, through their agents, servants, and employees, including but not limited to the Defendant Ying, were negligent in the inspection, testing, and initial commissioning of the machine, and negligently allowed the machine to be passed at acceptance testing, and authorized its use in the treatment of patients, including the Plaintiff Amanda Barge.

38.    It is asserted that the Defendants, and each of them, negligently failed to ascertain that the x-ray machine was not working properly and negligently allowed the machine to be accepted and cleared for use in the treatment of patients.

39.    As a direct and proximate result of the negligence of the Defendants, and each of them, the Plaintiff Amanda Barge was administered radiation therapy in May and June, 1999, which resulted in the Plaintiff receiving a radiation significantly in excess of that which was prescribed and properly to have been administered to her.  The Plaintiff Amanda Barge sustained severe permanent full thickness radiation burns in the area of the right upper lip and face.

40.    The Plaintiff alleges that had those Defendants conformed with the applicable standards of care, and exercised their duty in an appropriate fashion, the machine utilized by the Defendants in providing radiation treatment to the Plaintiff Amanda Barge would have been properly evaluated and adjusted such that excess radiation would not have been allowed to be

12

administered to the Plaintiff Amanda Barge. Thus, permanent burning, scarring, and disfigurement would have been avoided.

41.    Further, had the Defendants evaluated, inspected, calibrated, and tested the machine in accordance with the standards of care applicable, the Plaintiff Amanda Barge would not have received excessive radiation and resulting burns, would not have been required to undergo debridement and excision of dead tissue through surgical procedure in August, 1999, nor would she have been required to undergo skin grafting surgery in August of 1999 as well.

42.    Further, had the Defendants, and each of them, acted in accord with the applicable standards of care and properly and adequately evaluated, inspected, tested, and calibrated the radiation machine, the Plaintiff Amanda Barge would not have been required to undergo additional surgery in March, 2000 including scar revision surgery, in an effort to minimize the significant scarring and disfigurement that the Plaintiff sustained as a result of the negligent over-radiation. The Plaintiff Amanda Barge will require yet another additional surgery in the future in order to reconstruct the scarred area of the face and lip which was negligently allowed to occur.

43.    As a direct and proximate result of the Defendants' negligence, and each of them, the Plaintiff has in the past, is presently, and will in the future, continue to suffer unending physical pain, emotional anguish, fear, and anxiety, over her condition; she has lost her formal state of emotional and physical well-being; and has been unable to engage in and/or resume her normal activities, including employment, for an extensive period of time.

44.    It is further alleged that the Plaintiff has in the past, is presently, and will in the future, incur significant hospital, surgical, physiotherapeutic, pharmacological, custodial, and other losses and expenses for which claim is made.

13

45.    The Plaintiff refers to the negligence of the Defendants William Ying, Ph.D., Equimed, Inc., Comprehensive Physics and Regulatory Services, Ltd., and Keystone Oncology, LLC, as the sole and proximate cause of all of the injuries, damages, and disability sustained – with the Plaintiff being in no contributorily negligent.

WHEREFORE, the Plaintiff Amanda Barge demands judgment against the Defendants Equimed, Inc., Comprehensive Physics and Regulatory Services, Ltd., and William Ying, Ph.D., jointly and severally in the sum of One Million Dollars ($1,000,000.00).

## COUNT V

**Amanda Barge v. Comprehensive Physics and Regulatory Services, Ltd.**

**Negligence – Respondeat Superior**

46.    The Plaintiff incorporates in this Count those facts as set forth in Count IV hereinabove by reference thereto intending that each and every allegation hereinabove be deemed part hereof as if the same were repeated herein.

47.    The Defendant Comprehensive Physics and Regulatory Services, Ltd. is a professional corporation doing business in the Commonwealth of Pennsylvania, for the purpose of among other things, providing medical equipment including the used/refurbished superficial x-ray machine involved with the treatment of Plaintiff Amanda Barge, to radiation oncology centers throughout the Commonwealth, as well as acceptance testing and commissioning, and ongoing calibration, of such machine.

48.    At all times relevant hereto, the Defendant William Ying, Ph.D. was acting individually and as the agent, servant, and/or employee of the Defendant Comprehensive Physics and Regulatory Services, Ltd.

14

49.    The Defendant William Ying, Ph.D. committed acts and/or omissions within the scope of his employment with the Defendant Comprehensive Physics and Regulatory Services, Ltd., causing injuries and damages to the Plaintiff as aforesaid.

WHEREFORE, the Plaintiff Amanda Barge demands judgment against the Defendant Comprehensive Physics and Regulatory Services, Ltd. in the sum of One Million Dollars ($1,000,000.00).

## COUNT VI

### Amanda Barge v. Equimed, Inc.

### Negligence – Respondeat Superior

50.    The Plaintiff incorporates in this Count those facts as set forth in Count IV hereinabove by reference thereto intending that each and every allegation hereinabove be deemed part hereof as if the same were repeated herein.

51.    The Defendant Equimed, Inc. is a professional corporation doing business in the Commonwealth of Pennsylvania, for the purpose of among other things, providing medical equipment including the used/refurbished superficial x-ray machine involved with the treatment of Plaintiff Amanda Barge, to radiation oncology centers throughout the Commonwealth, as well as acceptance testing and commissioning, and ongoing calibration, of such machine.

52.    At all times relevant hereto, the Defendant William Ying, Ph.D. was acting individually and as the agent, servant, and/or employee of the Defendant Equimed, Inc.

53.    The Defendant William Ying, Ph.D. committed acts and/or omissions within the scope of his employment with the Defendant Equimed, Inc., causing injuries and damages to the Plaintiff as aforesaid.

15

WHEREFORE, the Plaintiff Amanda Barge demands judgment against the Defendant Equimed, Inc. in the sum of One Million Dollars ($1,000,000.00).

## COUNT VII

### Amanda Barge v. Keystone Oncology, LLC

### Negligence – Respondeat Superior

54.     The Plaintiff incorporates in this Count those facts as set forth in Count IV hereinabove by reference thereto intending that each and every allegation hereinabove be deemed part hereof as if the same were repeated herein.

55.     The Defendant Keystone Oncology, LLC is a professional corporation doing business in the Commonwealth of Pennsylvania, for the purpose of among other things, providing medical oncology treatment to patients using medical equipment including the used/refurbished superficial x-ray machine involved with the treatment of Plaintiff Amanda Barge.

56.     At all times relevant hereto, the Defendant William Ying, Ph.D. was acting individually and as the agent, servant, and/or employee of the Defendant Keystone Oncology, LLC.

57.     The Defendant William Ying, Ph.D. committed acts and/or omissions within the scope of his employment with the Defendant Keystone Oncology, LLC, causing injuries and damages to the Plaintiff as aforesaid.

WHEREFORE, the Plaintiff Amanda Barge demands judgment against the Defendant Keystone Oncology, LLC in the sum of One Million Dollars ($1,000,000.00).

16

## COUNT VIII

**Amanda Barge and Arthur Barge v. William Ying, Ph.D.,
Equimed, Inc., Comprehensive Physics and Regulatory Services, Ltd., and
Keystone Oncology, LLC**

### Loss of Consortium

58.     The Plaintiffs incorporate in this Count those facts set forth in Count I hereinabove by reference thereto intending that each and every allegation hereinabove be deemed part hereof as if the same were repeated herein.

59.     The Plaintiffs allege that they are husband and wife.  As the result of the negligence of the Defendants, the Plaintiffs assert that their marriage and marital relationship was interrupted and continues to be interrupted.

60.     The severe, unrelenting pain, from which the Plaintiff Amanda Barge suffers as well as the permanent scarring and disfigurement sustained as a result of the negligence of the Defendants, has permanently interrupted and damaged the Plaintiffs' marriage and the Plaintiff Amanda Barge's ability to function as a normal wife.

61.     By reason of the injuries to Plaintiff Amanda Barge, Plaintiff Arthur Barge has suffered great mental anguish by being forced to witness the suffering endured by his wife, whereby his own nerves and health have been seriously and permanently shocked, weakened, and impaired, and by reason of the physical and mental condition of his wife, Plaintiff's husband still continues to suffer in mind and body, and has been denied the care, protection, consideration, companionship, aid, and society of his wife, and the pleasure and assistance of his wife in maintaining their household.

WHEREFORE, Plaintiffs Amanda Barge and Arthur Barge demand judgment against the Defendants William Ying, Ph.D., Equimed, Inc., Comprehensive Physics and Regulatory

17

Services, Ltd., and Keystone Oncology, LLC, jointly and severally, for the loss of consortium, in the amount of Five Hundred Thousand Dollars ($500,000.00).

Respectfully submitted,

Dated: 5/3/01

_____
Richard Oare, Esquire
U.S. Dist. Ct. M. D. ID #02985
1776 South Queen Street
York, Pennsylvania 17403
(717) 846-3000

Dated: 5/3/01

_____
Louis G. Close, III, Esquire
Louis G. Close, III, P.A.
22 West Pennsylvania Avenue, Suite 300
Towson, Maryland 21204
(410) 296-3606

## VERIFICATION

I, LOUIS G. CLOSE, III Esquire, being duly sworn according to law, deposes and says that he is the attorney for the Plaintiffs Amanda Barge and Arthur Barge, who were not available, and, as Plaintiffs' attorney, he states that the facts set forth in Plaintiffs' Complaint are true and correct to the best of his knowledge, information and belief.

DATED: 5/3/01

_____
LOUIS G. CLOSE, III

18

## CERTIFICATE OF SERVICE

I, Janice S. Hendler, Paralegal for Richard Oare, Esquire, hereby certify that I have this 3rd

day of May, 2001, sent a true and correct copy of the foregoing Amended Complaint to counsel of

record, via United States Mail, postage paid, addressed as follows:

Andrew Briggs, Esquire
**Post & Schell, P.C.**
240 Grandview Avenue
Camp Hill, PA  17011

Louis G. Close, III, Esquire
22 W. Pennsylvania Avenue
Towson, MD  21204

Janice S. Hendler, Paralegal

**EXHIBIT B**

BY MR. CLOSE:

1

2    Q    Approximately what year.

3    A    I don't know.  I don't know.

4    Q    Is it fair to say that it was at

5 sometime in the mid 1990s that the name changed

6 from Oncology Services to Equimed?

7    A    I don't have no idea.

8    Q    Okay.  Who are you currently

9 employed by?

10   A    CPRS.

11   Q    What does that stand for?

12   A    It's Comprehensive Physics and

13 Service (sic).

14   Q    For how long have you been employed

15 by CPRS?

16   A    I cannot remember the detail,

17 because for me, it's still same office.  So the

18 name changed; but for me, the position still the

19 same.  It didn't change.  So I cannot recall

20 actually the date.

21   Q    Going back in time to April 1999,

22 who was your employer at that time, at the time

23 that the treatment was rendered to Mrs. Barge?

24   A    I think it's CPRS.

25   Q    Okay.  From 1992 when you stopped

1    working at the Harrisburg Cancer Center --

2        A    Um-hum.

3        Q    You were going to say something?

4        A    I'm sorry.  I'm not sure for the

5    detail.  You're asking me the 1999, April --

6        Q    Yes.

7        A    -- employed by CPRS?  I'm not very

8    sure is it CPRS or the other company name.

9        Q    Keystone?

10       A    Yeah.  No, it's not Keystone,

11   because before CPRS, it's the physics department

12   and the Equimed.  Then they separate, becoming

13   one company.  So the leader -- department

14   chairman is Dr. Bill Walker.  CPRS leader is Bil

15   Walker.  So for me, just stay right there, work

16   for the same person, same leader, reported to th

17   same body.  So I cannot recall what date it stop

18   or beginning -- actually is becoming CPRS.  So I

19   want to say -- I'm sorry.  This is too

20   complicated to me -- for me as an employee, you

21   know.  I just --

22       Q    I'm just trying to figure out who

23   you understand your employer was during that

24   time.

25       A    Okay.

# EXHIBIT C

1       Q     What did Dr. Salinger do while he was

2  working for your PC?

3       A     Well, he was hired as a medical director

4  to run this practice.

5       Q     Where was he supposed to do that?

6       A     Heritage Hills.

7       Q     Is that the full name, Heritage Hills?

8       A     That is what the physical -- that is where

9  the --

10      Q     It's called Heritage Hills Oncology

11  Treatment Center or something like that?

12      A     I believe so.

13      Q     Is that what it was called?

14      A     I believe so.

15      Q     Who owned Heritage Hills?

16      A     Well, okay.  There are different entities

17  in the picture.

18      Q     Right.

19      A     These practices were both in 1999.  The

20  Professional Corporation hires the physicians, and

21  there is also what we call technical component.  Like

22  if you go in the hospital, the hospital is a different

23  entity than the physicians practicing there.  The

24  buildings are a different entity and the land is a

25  different entity, but basically what makes the practice

8

1    is the physician component and the technical component

2    which means the machines and all of the other staff.

3              The technical component is owned by the --

4    both under the name of Keystone Oncology.  Keystone

5    Oncology does not own the building -- did not own the

6    building.  That was a lease process I believe.

7         Q         So Keystone Oncology, LLC, as I understand

8    it --

9         A         Uh-huh.

10         Q         -- leased the facilities at Heritage

11    Hills; is that correct?

12         A         They lease and the -- all of the technical

13    components come under that.  So when you do the

14    service, you have the therapist, you have the cleaning,

15    you have the secretarial service, you have the

16    machines, and that LLP contracts also the physicist,

17    and that all goes under technical component.

18         Q         So if I understand you correctly, your PC,

19    Central PA Radiation Oncology, PC --

20         A         Uh-huh.

21         Q         -- provided the doctor care --

22         A         Uh-huh.

23         Q         -- for the patients at these different

24    facilities which included Heritage Hills.

25         A         Right.

# EXHIBIT D

# TECHNICAL SERVICES AGREEMENT

THIS **TECHNICAL SERVICES AGREEMENT** (this "Agreement") is made and entered into as of this 22nd day of December, 1998 by and between **KEYSTONE ONCOLOGY, LLC**, a Pennsylvania limited liability company (the "Treatment Center"), and **COMPREHENSIVE PHYSICS AND REGULATORY SERVICES, LTD.,** a Nevada corporation ("Contractor").

### W I T N E S S E T H:

WHEREAS, the Treatment Center is the owner of three cancer treatment facilities, with such facilities located in Harrisburg, Pennsylvania, Littlestown, Pennsylvania, and Lebanon, Pennsylvania;

WHEREAS, Contractor is in the business of providing physics, administrative and regulatory services to such facilities; and

WHEREAS, the Treatment Center desires to engage the services of Contractor upon the terms and conditions hereinafter set forth, and Contractor desires to accept such engagement;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto do hereby agree as follows:

Section 1.      Engagement of Contractor.   The Treatment Center hereby engages Contractor on an exclusive basis to provide certain services in connection with the Treatment Center's business, and Contractor hereby agrees to provide such services for the three cancer treatment facilities, all as set forth herein, subject to the terms and conditions hereof.

Section 2.      Contractor Services.   Pursuant to this Agreement, Contractor shall facilitate performance of the following activities for the three cancer treatment facilities:

(A)      Physics Coverage.      The provision of comprehensive physics services as reasonably may be requested by the Treatment Center and including but not limited to physics coverage (including high dose rate and seed implant coverage), required dosimetry services, radiation therapy equipment and facility related licensure and/or inspection (state, federal and/or otherwise), and oversight of maintenance of the radiation oncology equipment of the Treatment Center, annual calibration and/or acceptance testing of all radiation oncology equipment.

(B)      Payment of Accounts and Indebtedness.      The processing of payment of payroll, trade accounts, taxes, bills and disbursements, and all other obligations arising out of the

1



radiation oncology operations of the Treatment Center in the ordinary course of business.

(C)    Accounting and Financial Records.    The provision of comprehensive accounting and financial services as reasonably may be requested by the Treatment Center and including but not limited to the administration of systems for the development, preparation, and custody of records and books of account relating to the radiation oncology facilities of the Treatment Center. Contractor shall prepare monthly financial statements for the Treatment Center with respect to the radiation oncology operations of the Treatment Center, including any requested financial analysis reports.

(D)    Data Processing.    The processing, storage, and retrieval of patient, medical, accounting, and financial information relating to the radiation oncology operations of the Treatment Center. The processing and collection of bills for the rendering of medical services provided by the Treatment Center. Notwithstanding the foregoing, Contractor shall not "code" any services provided at the Treatment Center. The Treatment Center and its affiliated physicians shall advise Contractor how all medical services shall be coded for purposes of medical reimbursement. Further, Contractor agrees that the Treatment Center shall have the right to nominate a party other than Contractor (the "Nominated Party") for the processing and collection of bills rendered to Medicare, Medicaid, and CHAMPUS for medical services and that the costs for such services of Nominated Party shall be paid by the Treatment Center. The Treatment Center shall be entitled to directly offset any such costs paid by the Treatment Center against amounts owed by the Treatment Center to Contractor up to an amount equal to 7 % of the total amount billed to Medicare, Medicaid, and CHAMPUS by Nominated Party on behalf of the Treatment Center.

(E)    Employee Benefits Administration.    The administration of employee benefit programs applicable to the staff working at the Treatment Center.

(F)    Software Support.    The provision of comprehensive software and software systems services for the Treatment Center as reasonably may be requested from time to time by Treatment Center.

(G)    Tax and Insurance.    The preparation of federal, state, and local tax returns of the Treatment Center, including oversight and involvement and/or representation in matters pertaining to any such federal, state, and local tax returns as reasonably may be requested by the Treatment Center including but not limited to audits, administrative proceedings, and judicial proceedings. Oversight and or negotiation of all insurance coverage matters for the Treatment Centers.

Contractor and the Treatment Center shall use their best efforts to reduce to writing, by February 1, 1999, a listing of those items which Contractor and the Treatment Center agree may be reasonably requested by the Treatment Center pursuant to the provisions of this Section 2 which are in addition to items specifically set forth herein.

2

Section 3.    Independent Contractors.    In the performance of this Agreement, the Treatment Center and Contractor each shall be independent contractors and not partners, joint venturers, agents or employees of the other.  The Treatment Center and Contractor shall each be solely responsible for its own respective actions.  Nothing herein shall be deemed to prohibit Contractor from performing similar services for other parties.  In rendering the services provided for herein, Contractor shall neither have nor exercise any control or direction over the methods or manner by which medical professionals working at the Treatment Center shall practice medicine and/or code medical services provided at the Treatment Center.

Section 4.    Compensation.    As compensation for the continuing services provided hereunder, the Treatment Center agrees to pay to Contractor, during each calendar year during which this Agreement is effective, compensation (the "Compensation") equal to TWENTY-FIVE PERCENT (25%) of annual Net Collections of the Treatment Center.

The Compensation shall be payable to Contractor as follows:

(1) fifteen percent (15%) of the accrued net revenue of the Treatment Center for any month while this Agreement is in effect (the "Monthly Payment Amount") shall be paid to Contractor by the tenth day of the following month, and

(2) prior to or on each May 15 which occurs while this Agreement is effective,

(a) the Treatment Center shall remit to Contractor the amount, if any, by which twenty-five percent of Net Collections for the months of January, February, and March which immediately precede such May 15 exceeds the total of the Monthly Payment Amounts for the months of January, February, and March which immediately precede such May 15 less any set-offs provided to Treatment Center pursuant to this Agreement, and

(b) Contractor shall remit to the Treatment Center the amount, if any, by which the total of the Monthly Payment Amounts for the months of January, February, and March which immediately precede such May 15 exceeds twenty-five percent of Net Collections for the months of January, February, and March which immediately precede such May 15, and

(3) prior to or on each August 15 which occurs while this Agreement is effective,

(a) the Treatment Center shall remit to Contractor the amount, if any, by which twenty-five percent of Net Collections for the months of April, May, and June which immediately precede such August 15 exceeds the total of the Monthly Payment Amounts for the months of April, May, and June which immediately precede such August 15 less any set-offs provided to Treatment Center pursuant to this Agreement, and

(b) Contractor shall remit to the Treatment Center the amount, if any, by which

3



SENT BY: ED & GEORGE;            814 867 2015;        MAR-5-03 12:04PM;        PAGE 6/12

the total of the Monthly Payment Amounts for the months of April, May, and June which immediately precede such August 15 exceeds twenty-five percent of Net Collections for the months of April, May, and June which immediately precede such August 15, and

(4) prior to or on each November 15 which occurs while this Agreement is effective,

(a) the Treatment Center shall remit to Contractor the amount, if any, by which twenty-five percent of Net Collections for the months of July, August, and September which immediately precede such November 15 exceeds the total of the Monthly Payment Amounts for the months of July, August, and September which immediately precede such November 15 less any set-offs provided to Treatment Center pursuant to this Agreement, and

(b) Contractor shall remit to the Treatment Center the amount, if any, by which the total of the Monthly Payment Amounts for the months of July, August, and September which immediately precede such November 15 exceeds twenty-five percent of Net Collections for the months of July, August, and September which immediately precede such November 15, and

(5) beginning with the second February 15 which occurs while this Agreement is effective, and ending with the February 15 which occurs following the term of this Agreement,

(a) the Treatment Center shall remit to Contractor the amount, if any, by which twenty-five percent of Net Collections for the months of October, November, and December which immediately precede each such February 15 exceeds the total of the Monthly Payment Amounts for the months of October, November, and December which immediately precede each such February 15 less any set-offs provided to Treatment Center pursuant to this Agreement, and

(b) Contractor shall remit to the Treatment Center the amount, if any, by which the total of the Monthly Payment Amounts for the months of October, November, and December which immediately precede each such February 15 exceeds twenty-five percent of Net Collections for the months of October, November, and December which immediately precede each such February 15.

For purposes of this Agreement, the term "Net Collections" shall mean the total cash payments received by the Treatment Center for radiation oncology services rendered at the Treatment Center, less refunds and repayments, etc., if any. Net Collections shall include both collected technical fees and professional fees.

Section 5.    Indemnity by Contractor.    Contractor hereby agrees to indemnify, defend and hold harmless the Treatment Center from and against any and all claims, demands, losses, liabilities, actions, lawsuits, and other proceedings, judgments and awards, and costs and

4

Case 1:00-cv-01881-CCC        Document 58        Filed 03/10/2003        Page 39 of 50

expenses (including without limitation reasonable attorneys' fees and expenses) arising directly or indirectly, in whole or in part, out of any intentional or grossly negligent act or omission of Contractor or Contractor' employees in the performance of Contractor's duties hereunder. Contractor shall maintain during the term of this Agreement comprehensive general liability insurance in an amount not less than $500,000 per claim/$1,000,000 aggregate and shall provide the Treatment Center upon written request certificates evidencing such insurance from time to time in effect. The indemnification provisions of this Section 5 shall survive termination of this Agreement.

Section 6.        Indemnity by the Treatment Center. The Treatment Center hereby agrees to indemnify, defend and hold harmless Contractor from and against any and all claims, demands, losses, liabilities, actions, lawsuits and other proceedings, judgments and awards, and costs and expenses (including without limitation reasonable attorneys' fees and expenses) arising directly or indirectly, in whole or in part, out of any intentional or grossly negligent act or omission of the Treatment Center or any person working at the Treatment Center, to the extent that losses are not recovered from insurance. The Treatment Center shall maintain during the term of this Agreement professional liability insurance with limits not less than $200,000 per claim/ $600,000 aggregate. The Treatment Center shall maintain comprehensive general liability insurance with limits of not less than $500,000 per claim/$1,000,000 aggregate and shall provide Contractor upon written request certificates evidencing such insurance from time to time in effect. The indemnification provisions of this Section 6 shall survive termination of this Agreement.

Section 7.        Duration, Termination and Default.

7.1        Term. This Agreement shall be effective as of January 1, 1999 (the "Commencement Date") and shall continue for fifteen (15) years, terminating on December 31, 2013.

7.2        Early Termination. Treatment Center shall have the right to terminate this Agreement with or without cause during the initial twenty four months of this Agreement by (i) written notice given to Contractor and (ii) tender of payment to Contractor in an amount equal to seven times the fee earned by Contractor hereunder during the twelve months immediately preceding termination, such amount to be annualized if Treatment Center terminates this Agreement before twelve months elapse from the Commencement Date. After the initial twenty four months of this Agreement, the Treatment Center shall have the right to terminate this Agreement with or without cause by (i) written notice given to Contractor and (ii) tender of payment to Contractor in accordance with the following schedule:

| If terminated during: | Payment is equal to the compensation paid pursuant to Section 4 during the preceding 12 months, times: |
| --- | --- |
| Years 3 through 5 | 6 |

5



Years 6 through 10                             4

Years 11 through 15                          2

This Agreement shall remain in full force and affect until such time as the early termination fee has been paid in full to Contractor.

**7.3**   **Default.**   If, at any time during the period that this Agreement is in effect, the Treatment Center is dissatisfied with Contractor's performance of Contractor's obligations and responsibilities hereunder, then the Treatment Center shall notify Contractor in writing as to the alleged default and shall provide Contractor with a written proposal to resolve the alleged default. Contractor shall have thirty (30) days following its receipt of said written proposal to cure the alleged default to the satisfaction of the Treatment Center. In the event that the Treatment Center is required to notify Contractor of the same alleged default in excess of two occasions, then in that event, the Treatment Center shall have the right to have the specific service which is the subject of the alleged default provided by a person or entity other than Contractor and in such instances the direct costs and/or fees incurred by the Treatment Center for the provision of the services by a person or entity other than Contractor shall be paid by the Treatment Center and offset by the Treatment Center against any amount owed by the Treatment Center to Contractor. Notwithstanding the foregoing, in the event that the Treatment Center terminates this Agreement for any reason whatsoever, the termination fees set forth in Section 7.2 shall apply in full and this Agreement shall remain in full force and effect until such time as such termination fees have been paid in full to Contractor.

**Section 8.**   **No Employment of Contractor Employees; Confidentiality.**   During the term of this Agreement and for two (2) years after termination hereof for any reason, the Treatment Center shall not without Contractor's written consent solicit the employment of, attempt to employ or contract with, or employ or contract with, any person who had been an employee of, or independent contractor to, Contractor at any time during the term of this Agreement. During the term of this Agreement and thereafter, the Treatment Center shall not disclose, publish, or use any confidential information of Contractor, not generally available to the public.

**Section 9.**   **Miscellaneous.**

**9.1**   **Severability.**   If any of the provisions, or portions thereof, of this Agreement are held to be unenforceable or invalid by any court, the validity and enforceability of the remaining provisions, or portions thereof, will not be affected and shall continue in force.

**9.2**   **Assignment and Subcontracts.**   Contractor shall have the right, without the Treatment Center's consent, to assign or subcontract all or any portion of this Agreement to any entity so long as Contractor remains liable for the performance of its obligations hereunder,

6



and/or as collateral security to any lender providing financing or refinancing funds or credit facilities to Contractor or its affiliates, or to any transferee of any of the stock, assets or business of Contractor; provided that no such assignment shall release Contractor from any liability hereunder. The Treatment Center shall have the right to assign this Agreement.

9.3    Notices. Any notices required or permitted hereunder shall be deemed effective if in writing and delivered (whether by hand, or certified U.S. mail, postage prepaid) to the parties at the following addresses:

Treatment Center:
Keystone Oncology, LLC
2515 Shawn Circle
State College, PA 16801

Contractor:
Comprehensive Physics and Regulatory Services, Ltd.
c/o Dr. William J. Walker
11928 Ropp Lane
Lovettsville, VA 20180

Notice of a change in address of one of the parties shall be given in writing to the other party as provided above. Notices delivered in person shall be deemed delivered on the date of delivery and notices mailed, as aforesaid, shall be deemed delivered forty-eight (48) hours after the date mailed. Rejection or other refusal to accept or inability to deliver because of a changed address of which no notice was given shall be deemed to be a receipt of the notice, request or other communication. Any notice, request or other communication required or permitted to be given by any party may be given by such party's legal counsel.

9.4    Rules of Construction. This Agreement shall be construed and interpreted under the laws of Nevada exclusive of the principles of conflicts of laws. The titles of sections and subsections herein have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions herein. All references herein to the singular shall include the plural, and vice versa. When general words or terms are used herein followed by the word "including" (or another form of the word "include") and words of particular and specific meaning, the general words shall be construed in their widest extent, and shall not be limited to persons or things of the same general kind or class as those specifically mentioned in the words of particular and specific meaning. No provision of this Agreement shall be construed against or interpreted to the disadvantage of a party by reason of such party having or being deemed to have drafted, structured or dictated such provisions. The provisions of this Agreement are to be construed in accordance with the standards of commercial reasonableness.

9.5    Remedies Cumulative. Except as otherwise expressly provided herein, all rights,

7

powers, and privileges conferred hereunder upon the parties hereto shall be cumulative and in addition to those other rights, powers, and remedies hereunder and those available at law or in equity. No party shall be obligated to make an election of remedies until the time of execution on a final judgment. All such rights, powers, and remedies may be exercised separately or at once, and no exercise of any right, power, or remedy shall be construed to be an election of remedies or shall preclude the future exercise of any or all other rights, powers, and remedies granted hereunder or available at law or in equity, except as expressly provided herein.

9.6     No Waiver. Neither the failure of either party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder, nor any custom or practice of the parties at variance with the terms hereof shall constitute a waiver or a relinquishment of either party's right to demand exact compliance with the terms hereof. To be effective, any waiver of any right hereunder must be in writing and is executed by the party against whom enforcement of such waiver is sought.

9.7     Amendments. No amendment to this Agreement shall be binding on any of the parties hereto unless such amendment is in writing and is executed by the party against whom enforcement of such amendment is sought.

9.8     Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute but a single instrument. Any signature page which has been the subject of telefax transmission shall be sufficient to bind any non-attesting signatory(ies) thereto as if any such page contained an original signature(s) in ink.

9.9     Exhibits. Each exhibit referred to in this Agreement is attached to and incorporated by reference into this Agreement.

9.10     No Corporate Practice of Medicine. To the extent any act or service required of Contractor in this Agreement should be construed or deemed by any governmental authority, agency or court to constitute the practice of medicine, the performance of said act or service by Contractor shall be deemed waived and forever unenforceable.

9.11     Binding Effect. All provisions of this Agreement shall be fully binding on all successors, assigns, heirs, transferees of Contractor and the Treatment Center.

9.12     Parties to the Agreement.     Contractor and Treatment Center agree and acknowledge that the only parties to this Agreement are Contractor and the Treatment Center.

8

IN WITNESS WHEREOF, the parties have had executed this Agreement by their respective authorized officers as of the day and year first above written.

**ATTEST:**

**Treatment Center:**

**KEYSTONE ONCOLOGY, LLC,**
a Pennsylvania limited liability company

By: _____
Title: _____

**ATTEST:**

**Contractor:**

**COMPREHENSIVE PHYSICS AND REGULATORY SERVICES, LTD.,**
a Nevada corporation

By: _____
Title: _____

keytech.doc

9

**IN WITNESS WHEREOF,** the parties have had executed this Agreement by their respective authorized officers as of the day and year first above written.

**Treatment Center:**

ATTEST:

**KEYSTONE ONCOLOGY, LLC.**
a Pennsylvania limited liability company

By: _____
Title: _____

**Contractor:**

ATTEST:

**COMPREHENSIVE PHYSICS AND REGULATORY SERVICES, LTD.,**
a Nevada corporation

By: _____
Title: PRESIDENT

keytech.doc

9

# EXHIBIT E

10-09-2001 04:30PM   FROM CPRS Service Division   TO   18148

00120

Service Division

1200 Dunsinane Hill

Chester Springs, PA

19425-1309

610-827-1557

Fax 610-827-1553

# Comprehensive Physics
# &
# Regulatory Services, Ltd.

Service Report

SR No. ____ 7686- 0001  page  of  1

Corporate Of

11928 Ropp L

Lovettsville,

201

540-822-51

Fax 540-822-41

| Center | Equipment | Mfg. | Model | | S/N | |
|---|---|---|---|---|---|---|
| Heritage Hills | Superficial X-Ray | UXR | | 3305 | | |

| Problem Reported: | | Date | 4/15/99 | In | 1400 | Out | 1700 |
|---|---|---|---|---|---|---|---|
| Install Universal Superficial X-Ray unit | | | 4/19/99 | | 1130 | | 1700 |
| | | | | | | | |
| | | | | | | | |

**Service Performed:**

| | Hours | | | |
|---|---|---|---|---|
| | 8.0 Labor | @ | 135 | 1,080.0 |
| 4/15 Picked up, delivered, assemble & leveled unit | 10.0 Travel | @ | 135 | 1,350.0 |
| | Expences | | | |
| | 467 Miles | @ | 0.32 | 149.4 |
| 4/19 Installed new armed cable runs for power & interlocks | Air,Car Rent,Lodging | | | |
| Modified conduit run for control cables | Meals,Parking,Tolls | | | |
| Mounted junction boxes for control, power | Material | | | |
| & transfer switch | Shipping | | | |
| Pulled control, power & interlock cables | | | Total | 2,579.4 |

| Bill To | | |
|---|---|---|
| Center | | |
| Contract | | |
| Service | | |
| Other | | |

| Warrenty | Beam | Filamer |
|---|---|---|
| Hours out | | |
| Hours in | | |
| Elapsed hrs | 0 | |

| Qty | Part Number | Description | Source | Unit cost | Amount |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Center Representative | Date 4/19/99 | Service Representative | (assisted b |
|---|---|---|---|
| | | *Joseph X Garman* Panichello | Maychak |
| | | | 5/11/99 |

srform.xls

00121

# Comprehensive Physics
## and
## Regulatoty Services, Ltd.

Service Division
1200 Dunsinane Hill
Chester Springs, PA
19425-1309
610.827.1557
Fax 610.827.1553

Corpate Office
11928 Ropp Lane
Lovettsville, VA
20180
540.822.5161
Fax 540.822.4188

Service Report No.  9407- 0299  page  1  of  1

| Center | Equipment | Mfg. | Model | | S/N | | |
|--------|-----------|------|-------|--|-----|--|--|
| Heritage Hills | Superficial X-ray | UXR | | 3305 | | | |

| Problem Reported: | | Date | 4/19/99 | In | 1200 | Out | 2000 |
|-------------------|--|------|---------|----|------|-----|------|
| Install superficial therapy unit | | | 4/20/99 | | 800 | | 1600 |
| | | | 4/26/99 | | 1330 | | 1600 |

| Service Performed: | | | | |
|--------------------|--|--|--|--|
| Installed superficial therapy unit: | | Hours | | |
| | | 18.0 Labor @ 135 | | 2,430. |
| | | 16.0 Travel @ 135 | | 2,160. |
| Installed tube/couch assembly, door & linac/superficial | | Expences | | |
| interlocks, patient surveillance camera. | | 870 Miles @ 0.32 | | 278. |
| Mounted control with removable connections. | | Air,Car Rent,Lodging | | 81. |
| Reinstalled modified shelf under viewbox. | | Meals,Parking,Tolls | | 53. |
| | | Material | | |
| Calibrated x-ray output. | | Shipping | | |
| | | Total | | 5,003. |
| Performed final acceptance testing w/physicist. | | Bill To | | |
| All tests passed. | | Center | | 5,003. |
| Dr. Ying has sent out test chamber for calibration. | | Contract | | |
| He will set treatment doses when equipment returns. | | Service | | |
| | | Other | | |
| Installation completed. | | Warrenty | Beam | Filame |
| | | Hours out | | |
| | | Hours in | | |
| | | Elapsed hrs | 0 | |

| Qty | Part Number | Description | Source | Unit cost | Amount |
|-----|-------------|-------------|--------|-----------|--------|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Center Representative | Date | Service Representative | (assisted b |
|-----------------------|------|------------------------|-------------|
| | 4/26/99 | Joseph J. Panichello | |

srform.xls                                                    5/25/99

**EXHIBIT F**

1    installed?

2         A       Can you say it again?

3         Q       Yes.  Approximately when in time wa

4    it that the superficial X-ray unit was installe

5    at Heritage Hills?

6         A       They install 1999, like April.

7         Q       April 1999?

8         A       Yes.

9         Q       Did you provide the acceptance

10   testing for that superficial unit that was

11   installed in April of 1999 at Heritage Hills?

12        A       Yes.  Before, they spend a lot of

13   time to installa -- installation for that

14   machine, because they feeling lot of problem, lo

15   of question about that.  Then finally, like,

16   almost end of March -- end of April, they finish

17   installation.

18        Q       When you say "they," who are you

19   referring to?

20        A       They is the service department,

21   engineering.

22        Q       Of what company?

23        A       Service department, engineering --

24   if we say at that time it was CPRS, they belong

25   to CPRS.

**EXHIBIT G**