Page 94

1  burning and stinging sensation was constant and
2  remained?
3      A   Constant, yes.
4      Q   Was it still confined just to the area of
5  treatment or did the location change in some way?
6      A   It was the area of the treatment.
7      Q   Did it ever seem to get larger or smaller in
8  terms of the area of this burning or stinging
9  sensation?
10     A   No.
11     Q   You said that you had a feeling of numbness
12 on the surface of your skin in that area. Did that
13 ever improve?
14     A   No.
15     Q   Do you still have that today?
16     A   Today, yes, it's all numb.
17     Q   When you say it's all numb, what do you
18 mean?
19     A   Even after all the surgeries, it will always
20 be numb.
21     Q   I'm trying to get a sense of what specific



Page 95

1  area on your face is numb.
2      A   That whole area. The same area. The whole
3  area.
4      Q   From the fold in your nose, over your cheek,
5  to the corner --
6      A   Right down here.
7      Q   -- of your mouth on the right?
8      A   Yes.
9      Q   Has any doctor ever told you that that will
10 improve with time?
11     A   No.
12     Q   Has any doctor told you that that's
13 permanent?
14     A   Yes.
15     Q   Who's told you that's a permanent condition?
16     A   Dr. Manson.
17     Q   Who is Dr. Manson?
18     A   He's my plastic surgeon.
19     Q   While you were receiving treatment and
20 follow-up at the Heritage Hills Cancer Center, you
21 told us that you were speaking with Dr. Salinger. Is



Page 96

1  that right?
2      A   Right.
3      Q   And you also on occasion during the course
4  of the treatments spoke with the technicians. Is that
5  right?
6      A   Right.
7      Q   Anybody else at the Heritage Hills Cancer
8  Center that you would have spoken with, other than the
9  technicians or Dr. Salinger?
10     A   No.
11     Q   Do you know who William Ying is?
12     A   No.
13     Q   Have you ever met Dr. Ying?
14     A   No.
15     Q   Now you told us that Dr. Salinger, after he
16 stopped the treatments, referred you back to Dr.
17 Miller. Is that right?
18     A   Right.
19     Q   And Dr. Miller was the plastic surgeon you
20 were initially referred to?
21     A   Right.

Page 97

1      Q   What did Dr. Miller say when you had the
2  appointment with the doctor following your treatments?
3      A   Following the treatments? She looked at it
4  and was in agreement with Dr. Salinger. She told me
5  to think of it as a very bad sunburn. It's going to
6  take six to eight weeks to clear up, and I just have
7  to be patient.
8      Q   Did you continue to visit with Dr. Miller as
9  you were seeing Dr. Salinger?
10     A   During my last appointment that I had with
11 Dr. Salinger he told me that it was pointless to see
12 me every week or every two weeks, that he was going to
13 start seeing me every six weeks. But during that time
14 in between, he would like me to see Dr. Miller. So I
15 would see him every six weeks and see her in between,
16 like on the third week.
17     Q   Did there come a time when you stopped
18 seeing Dr. Salinger altogether?
19     A   Yes.
20     Q   When was that?
21     A   The end of July.

# EXHIBIT H

Page 74

1  A  I don't know. None that I'm there for.
2  Q  I asked your wife this same question, but I
3  just want to get your sense of what the best-case
4  scenario that you realistically hope for in terms of
5  this last procedure and whatever the doctors can do in
6  terms of touching it up this summer, what are your
7  expectations in that regard?
8  A  Her to be happy.
9  Q  Do you hold out hope that she will be able
10 to not use a bandage and feel confident to go out in
11 public?
12 A  I don't know.
13 Q  Have you had any discussions with your wife
14 or your wife's physicians about the last procedure
15 being such that we should get her back to a certain
16 stage or anything like that?
17 A  No.
18 Q  Sir, can you tell me whether you believe
19 that the surgeries that she's had these past few years
20 have made any improvement in terms of her appearance
21 compared to the way she was before Dr. Wong's

Page 75

1  procedure?
2  A  Based on conversations with her, yes.
3  Q  They have improved?
4  A  Yes.
5  Q  Have you ever had any contact with Dr.
6  Salinger?
7  A  No.
8  Q  Have you ever had any contact with anyone
9  associated with Keystone Oncology?
10 A  No.
11     MR. BRIGGS: That's all I have. Thank
12 you.
13     EXAMINATION
14 BY MR. RICCI:
15 Q  Do you know who Dr. Ying is?
16 A  No.
17 Q  You never met Dr. Ying?
18 A  No, sir.
19 Q  Do you know what role Comprehensive Physics
20 & Regulatory Services plays in this case?
21 A  No.

Page 76

1     MR. RICCI: I have no further
2  questions. Thank you.
3     MR. CLOSE: I'll save mine for trial.
4     (The deposition concluded at 2:33 p.m.)

Page 77

1     CERTIFICATE OF NOTARY PUBLIC
2     I, Linda H. Cole, the officer before whom
3  the foregoing deposition was taken, do hereby certify
4  that the foregoing transcript is a true and correct
5  record of the testimony given; that said testimony was
6  taken by me stenographically and thereafter reduced to
7  typewriting under my supervision; and that I am
8  neither counsel for, related to, nor employed by any
9  of the parties to this case and have no interest,
10 financial or otherwise, in its outcome.
11     IN WITNESS WHEREOF, I have hereunto set my
12 hand and affixed my notarial seal this 17th day of
13 January, 2002.
14     My commission expires July 1, 2002
15
16
17 _____
18     NOTARY PUBLIC IN AND FOR
19     STATE OF MARYLAND

# EXHIBIT I

14 of 100 DOCUMENTS

SHARON ROHRBACH, et al., Plaintiffs v. AT&T NASSAU METALS CORP., et al., Defendants

No. 3:CV-89-1268

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

*1994 U.S. Dist. LEXIS 14468*

June 22, 1994, Decided

June 22, 1994, Filed

**JUDGES:**
[*1] McClure, Jr.

**OPINIONBY:**
JAMES F. McCLURE, JR.

**OPINION:**

MEMORANDUM (#1)

June 22, 1994

**I. BACKGROUND:**

This is an environmental contamination case filed August 31, 1989 in which ten individual plaintiffs have asserted claims against defendants American Telephone and Telegraph Company (AT&T); AT&T Nassau Metals Corp. (Nassau); Lurgan Corporation (Lurgan); Joseph Brenner and C&D Recycling, Inc. (C&D). Lurgan operated a recycling center adjacent to plaintiffs' properties in Foster Township, Luzerne County, Pennsylvania from 1966 through 1978. In 1978, the facility was sold to C&D, which operated it until 1984, when all operations ceased. The property was the site of a clean-up effort spearheaded by the Environmental Protection **Agency** (EPA).

During the years it was in operation, the facility's primary function was reclaiming materials (primarily lead and copper) from coated telephone cable supplied by AT&T. This was done pursuant to consignment contracts with an AT&T subsidiary.

Plaintiffs allege federal causes of action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, *42 U.S.C. § § 9601* et seq, (CERCLA) (Count I) [*2] and the Racketeer Influenced and Corrupt Organizations Act, (RICO) *18 U.S.C. § § 1961* et seq. (Counts III, IV and V), as well as pendent state claims under the Pennsylvania Hazardous Sites Cleanup Act (PaHSCA), Pa. Stat. Ann., tit. 35, § § 6020.101 to 6020.1305 (Supp. 1992), (Count II) and for negligence (Count VI), n1 strict liability (Count VII), nuisance (Count VIII), trespass (Count IX), intentional infliction of mental and emotional distress and injury (Count X), and negligent infliction of mental and emotional distress and injury (Count XI). n2

n1 The negligence count is labelled Count IV in plaintiffs' amended complaint. This is obviously a typographical error, as it is the **sixth** count pled, so we will refer to it as Count VI. The same is true of Counts VII, VIII, IX, X, and XI, which were erroneously labelled Counts V, VI, VII, VIII and IX respectively.

n2 Plaintiffs' amended complaint, record document no. 33.

Before the court is a motion by AT&T and Nassau for [*3] partial summary judgment for all claims based upon theories of **vicarious liability.** (For purposes of this memorandum and order, the facility in question shall be

referred to as "the site." "Movants" shall refer to defendants AT&T and Nassau.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added).

... The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter [*4] of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett, 477 U.S. 317, 323-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra at 323 and 325.*

Issues of fact are genuine "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph, 842 F.2d 689, 694 (3d Cir. 1988),* citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* Material facts are those which will affect the outcome of the trial under governing law. [*5] *Anderson, supra, 477 U.S. at 248.* In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988).*

In addition to the foregoing principles of summary judgment,

6. All motions for summary judgment or partial summary judgment shall be accompanied by appendices containing documents cited in support of the party's position. All references in supporting or opposing briefs shall be supported by a reference stating **the exact location** in the supporting appendices where the information may be found. Failure to comply with this requirement will result in the court deeming the point cited unsupported by evidence in the record, a consideration the court will weigh accordingly in deciding whether to grant or deny the motion in question.

Order #2 dated *September 29, 1992, at 2-3 P 6* (record document no. 381; emphasis added).

## III. STATEMENT OF MATERIAL FACTS NOT GENUINELY IN DISPUTE

The following facts either [*6] have been admitted by plaintiffs or have not been shown to be genuinely in dispute as outlined above:

1. In 1931, Western Electric Co. ("Western"), which was owned by AT&T, acquired Nassau. Western's name was changed to AT&T Technologies, Inc., n3 in 1984. Finally, in 1989, Western was merged into AT&T. Between 1931 and 1989, then, AT&T was Nassau's corporate "grandparent," and Nassau has been a direct subsidiary of AT&T since 1989. AT&T currently owns 100% of the stock of Nassau.

n3 For purposes of this memorandum, Western Electric Co. and AT&T Technologies will be referred to as "Western."

2. Nassau owns a facility and has its headquarters in Staten Island, New York. Until September, 1990, Nassau owned a plant and had its headquarters in Gaston, South Carolina. Nassau is in the business of refining precious metals and manufacturing I precious metals materials. Formerly, it owned and operated a secondary copper refinery in Gaston.

3. Prior to its merger into AT&T, Western was a separate and distinct corporation and [*7] was the manufacturing and supply entity for the AT&T enterprise, sometimes known as the Bell System.

4. Nassau was at all times material hereto a separate, distinct, and viable corporate entity with its own board of directors, officers, employees, businesses and operations.

5. Nassau has observed and continues to observe the basic corporate formalities: it keeps its own books and records, and holds its own shareholder and board of directors meetings.

6. From 1962 through 1986, the members of Nassau's board of directors were employees of Nassau and Western. From 1986 to 1990, one of the members of Nassau's board was an AT&T employee and the rest were employees of Nassau or Western. During all the times Lurgan and C&D performed operations at the site, AT&T did not place its own employees on Nassau's Board. Movants have no common directors.

7. Nassau's board of directors, not AT&T, controls Nassau's management. AT&T did not place its personnel in Nassau's officer positions; nor did nor do Movants routinely interchange managerial or supervisory employees.

8. Movants have separate corporate headquarters, business properties and assets. AT&T does not use Nassau's property as its own.

9. [*8] Movants have separate and distinct business operating departments, salespeople and places of business.

10. The daily operations of Movants are separate. AT&T does not instruct Nassau on its day-to-day operations.

11. Nassau pays its own salaries and expenses, and prepares its own budget. Nassau has sufficient operating capital and would be able to pay any judgment in this case.

12. Nassau receives business from customers other than AT&T. Nassau is not a marketing organization or distributor for AT&T.

13. Lurgan carried on operations at its place of business in Freeland, Luzerne County, from sometime in the 1960's until sometime in 1979.

14. C&D carried on operations at the same place of business as Lurgan had from approximately 1979 until late 1983 or 1984 (1985, according to plaintiffs)

15. Pursuant to contracts, Nassau consigned scrap cable to Lurgan for the recovery of copper and lead. The recycled copper and lead were returned to Nassau or sent to its designee.

16. Pursuant to contract, Nassau consigned scrap cable and other materials to Lurgan's successor, C&D, for the recovery of copper.

17. In or about September 1985, the place of business at which Lurgan and C&D operated was [*9] included on EPA's National Priorities List.

18. AT&T had no authority or control and did not exercise any authority or control over Nassau's consignment of scrap to Lurgan or to C&D. Further, AT&T did not exercise any control over Nassau's consignment of scrap to the site.

19. Neither Nassau nor AT&T ever owned, controlled or operated Lurgan nor any entity that owned, controlled or operated Lurgan.

20. Neither Nassau nor AT&T ever owned, controlled or operated C&D nor any entity that owned, controlled or operated C&D.

21. During all times when scrap processing operations were conducted at the site, neither Nassau nor AT&T ever owned, controlled or operated the site.

22. AT&T never had a contract with either Lurgan or C&D, nor did AT&T have knowledge of the day-to-day activities of those companies.

23. AT&T never had anything to do with Lurgan or C&D, nor was AT&T ever a customer of Lurgan or C&D. Further, AT&T was not involved in any way with Lurgan or C&D until approximately 1986, when, after the site became a Superfund site, Nassau, as a Potentially Responsible Party, sought the help of AT&T's environmental engineering organization in responding to EPA regarding the site.

24. Neither [*10] Nassau nor AT&T controlled the manner of work done at Lurgan or C&D. Lurgan and C&D were responsible to Nassau for the results of their work. Neither Lurgan nor C&D granted Nassau by contract or otherwise any control as to how Lurgan or C&D operated or performed their work and Nassau never asserted any such control.

25. Lurgan and C&D owned and operated their own place of business, equipment and tools separate from Nassau and AT&T. They both had control of hiring and firing their own employees and did hire their own employees.

26. Neither Nassau nor AT&T ever engaged in or were responsible for scrap processing or other operations at the site.

27. Nassau was a mere supplier of materials to Lurgan and to C&D through consignment contracts; it provided scrap telephone cable and material for processing, and, pursuant to the consignment contracts, paid Lurgan or C&D, as the case may be, by the job or pound of scrap processed, not by the hour, for the recovery of copper and lead from the supplied materials. AT&T was not a party to the contracts and never sent any material to the site for processing. The payment term of the contracts typically provided:

Processing charges payable upon [*11] return of processed material, receipt of invoice and report of input

and output. Nassau weights and proper percentages to govern. On completion of contract, you are to furnish us with a final settlement report subject to our approval.

28. The contracts between Nassau and Lurgan or Nassau and C&D imposed no mandates, such as: use of space; use of signs; hours of operation; method or manner of repairs to the facility; manner of conduct, demeanor, or appearance of employees; or control over day-to-day activities or of longer term activities.

29. Lurgan and C&D had the right to and did engage in business with companies and organizations other than Nassau.

30. Nassau could not terminate its relationship with Lurgan or C&D except according to the terms of its various contracts with them. The contracts typically recited dates when the contracts were in effect.

31. The only visits to Lurgan or C&D or the site by Nassau employees were to discuss business or for the purpose of inventory assessment.

32. Lurgan and C&D were independent contractors.

## IV. THEORIES FOR IMPOSING VICARIOUS LIABILITY

Before reviewing the more substantial bases for the imposition of liability on AT&T and [*12] Nassau, it is important to note one theory of **vicarious liability** which will not be dealt with at length in this memorandum, that of conspiracy. We have held consistently throughout this litigation that plaintiffs have failed to produce one iota of evidence of a conspiratorial relationship, and they continue to rely on baseless allegations and unsubstantiated speculation. We reiterate: plaintiffs have failed to produce any evidence even remotely tending to suggest the existence of some nefarious enterprise existing to "cover up" the activities of AT&T and related entities concerning the site, and such speculative inference-drawing and innuendo will not be presented to a jury.

### A. Respondeat Superior

In Pennsylvania, a principal may be held liable for the torts of an agent when an employer/employee (or "master/servant") relationship exists between the two. *Juarbe v. City of Phila.*, 288 Pa. Super. 330, 431 A.2d 1073, 1076 (Pa. Super. 1981) (citations omitted). In *Surowski v. Commonwealth*, 78 Pa. Commw. 490, 467 A.2d 1373, 1374 (Commw. 1983), the factors to be considered in determining whether [*13] such a relationship exists are said to include: "the control of the manner that work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; the skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether the work is part of the regular business of the employer[;] and the right to terminate the employment at any time." (Citations omitted.) In this analysis, the key element is extent of control by the employer or master. *Juarbe, supra*, 431 A.2d at 1076 (citations omitted).

One who is engaged to perform tasks or to carry out the business of the principal and whose relationship does not rise to the level of employer/employee or master/servant, i.e. does the work according to his own methods and is responsible to the principal only as to the end product, is an independent contractor. See generally *Surowski, supra*. See also Black's Law Dictionary 770 (**6th** ed. 1990).

### B. Alter Ego

Generally, a shareholder [*14] of a corporation is not liable for the debts of the corporation, since the corporation is a separate legal entity. *Alexander v. I.R.S.*, 628 F. Supp. 433 (D. Del. 1985). See also 15 Pa. Cons. Stat. Ann. § 1526 and former § 1609. This rule applies where the shareholder is another corporation. See *B.D.W. Associates, Inv. v. Busy Beaver Bldg. Ctrs.*, 865 F.2d 65 (3d Cir. 1989). An exception to the general rule exists such that a court may "pierce the corporate veil" where the corporation is the alter ego of the shareholder. Id. In determining whether to disregard the corporate form, a court considers the following factors:

1. Failure to observe corporate formalities;
2. Non-payment of dividends;
3. Insolvency of the debtor corporation;
4. Siphoning off funds of the corporation by the dominant shareholder;
5. Non-functioning of other officers or directors;
6. Absence of corporate records;
7. The fact that the corporation is merely a facade for operations of the dominant stockholder or stockholders; and

8. Gross undercapitalization of the corporation.

*Id.* at 68 (citing *American Bell, Inc. v. Federation of Telephone Workers*, 736 F.2d 879 (3d Cir. 1984)). [*15]

### C. Peculiar Risk Doctrine

An exception to the concept of non-liability on the part of a principal unless one of the foregoing theories of **vicarious liability** applies is the peculiar risk doctrine, also known as the inherently dangerous activity doctrine. See generally Restatement (2d) of Torts §§ 416, 427 (adopted as the law in Pennsylvania in *Philadelphia*

*Electric Co. v. James Julian, Inc.*, 425 Pa. 217, 228 A.2d 669 (Pa. 1967). Under this doctrine, one who employs an independent contractor may be liable for the negligence of the independent contractor when the work entails a "peculiar risk" or a "special danger." *Mentzer v. Ognibene*, 408 Pa. Super. 578, 597 A.2d 604, 610 (Pa. Super. 1991), allocatur denied, 609 A.2d 168 (Pa. 1992).

This exception, however, is limited.

The risk of harm must arise from the peculiar or inherent nature of the task or the manner of performance, and not the ordinary negligence which might attend the performance of any task. "Liability does not ordinarily extent to so called 'collateral' or 'casual' negligence on [*16] the part of the contractor ... in the performance of the operative details of the work. The negligence for which the employer [of a general contractor] is liable must be such as is intimately connected with the work authorized and such as is reasonably likely from its nature."

*Mentzer, supra*, 597 A.2d at 610 (quoting *McDonough v. United States Steel Corp.*, 228 Pa. Super. 268, 324 A.2d 542, 546 (Pa. Super. 1974), which in turn quoted *Van Arsdale v. Hollinger*, 68 Cal. 2d 245, 437 P.2d 508, 512-513, 66 Cal. Rptr. 20 (Cal. 1968); emphasis added in Mentzer). This exception also applies when there is employment of an independent contractor to perform an abnormally dangerous activity. See Restatement (2d) of Torts § 427AA. n4 Otherwise, a special danger or peculiar risk exists when:

1) the risk is foreseeable to the employer of the independent contractor at the time the contract is executed, i.e., a reasonable person, in the position of the employer, would foresee the risk and recognize the need to take special measures; [*17] and

2) the risk is different from the usual and ordinary risk associates with the general type of work done, i.e., the specific project or task chosen by the employer involves circumstances that are substantially out-of-the-ordinary.

*Mentzer, supra*, 597 A.2d at 611 (quoting *Ortiz v. Ra-El Develonment Corp.*, 365 Pa. Super. 48, 528 A.2d 1355, 1358 (Pa. Super.), allocatur denied, 536 A.2d 1332 (Pa. 1987). The same court continued,

Stated another way, this definition of peculiar risk and special danger requires that "... the risk be recognizable in advance and contemplated by the employer at the time the contract was formed ... [and that] it must not be a risk created solely by the contractor's 'collateral' negligence'.... [i.e.,] negligence consisting wholly of the improper manner in which the contractor performs the operative details of the work."

*Mentzer, supra*, 597 A.2d at 611 (quoting *Marshall v. Southeastern Penna. Transportation Authority*, 587 F. Supp. 258, 263 (E.D. Pa. 1984)). [*18]

> n4 Activities which may constitute abnormally dangerous (or "ultrahazardous") activities are described in Restatement (2d) of Torts § § 519-524A. See especially § 520.

V. DISCUSSION:

The counts of the complaint to which **vicarious liability** applies include: Count VI (negligence); Count VII (strict liability); Count VIII (nuisance); Count IX (trespass); Count X (intentional infliction of emotional distress); and Count XI (negligent infliction of emotional distress). n5 It is clear that, should the motion for partial summary judgment be granted, only these counts of the complaint would be dismissed, and not all claims, as suggested by movants.

> n5 Count I (CERCLA) and Count II (PaHSCA) have statutory sections which define the liability of third persons in place of the common law concept of **vicarious liability.** The RICO claims (Counts III, IV, and V) necessarily involve third persons who may not have committed the alleged negligent act. These counts will be addressed in the memoranda addressed to the appropriate motions for partial summary judgment.

[*19]

Since AT&T may be liable only if Nassau is held liable, the potential liability of Nassau will be addressed first.

A. Nassau's Liability

Based upon the above-stated principles of law and the facts presented to the court, it is clear that Nassau may not be held liable to plaintiffs under a theory of respondeat superior, since the owners of the site were independent contractors with Nassau, and not employees. Lurgan and C&D were responsible under their contracts with Nassau for the end result only, and not the manner in which the work was done. Nassau supplied no tools or "know-how" to Lurgan or C&D. Nassau did no hiring or

firing for Lurgan or C&D. Most importantly, there is no evidence that Nassau exercised or could exercise any form of control over the daily operations of the site while it was operated by Lurgan or C&D. The obvious conclusion is that no employer/employee relationship existed between Nassau and either Lurgan or C&D, but that the latter entities were independent contractors with the former.

It also is clear that Nassau cannot in any way be considered the alter ego of either Lurgan or C&D. The record in no way indicates that the factors set forth in *B.D. W. Associates, supra,* [*20] favor such a determination.

On the other hand, it also is clear that Lurgan and C&D were independent contractors with Nassau, having agreed to perform the disposal/reclamation activity at issue, though not submitting to its control sufficiently to create an employer/employee relationship. The question, then, is whether the peculiar risk doctrine applies so as to subject Nassau to liability for the alleged tortious conduct of Lurgan or C&D.

It is unclear whether the handling of toxic substances at the site constitutes an abnormally dangerous activity. While the substances themselves may be dangerous, it is the manner in which they are handled, i.e., the activity, for which strict liability may be imposed; the source of strict liability is not the material itself, though that is a factor to be considered in the strict liability analysis. Cf. *Fallowfield Development Corp. v. Bryn Mawr Trust Co., 23 Envtl. L. Rep. 20, 119 (E.D. Pa. 1992)* (issue of whether defendants' handling of chemical substances was an abnormally dangerous activity was a question for the jury, since affidavits differed as to who handled the material, leaving a question of credibility.) [*21]

It is not necessary to reach this question, however, since the work to be performed at the site meets the two prongs of the test set forth in *Mentzer, supra.* A jury reasonably could find that Nassau would foresee the risk of the activity and recognize the need for special precautions since Nassau contracted for a particular purpose, supplied the materials to the operators of the site, and was itself engaged in a similar business. See Statement of Material Facts, PP 2, 27. Moreover, a jury reasonably could find that the risk is different from the usual and ordinary risk of reclaiming particular materials, since this reclamation involves separating the copper, etc., from other materials including toxic substances. In terms of the "restated" rule, a jury could find that the risk was foreseeable by Nassau and contemplated at the time of the contract, and that the risk was not created by the collateral negligence of the independent contractors but by the nature of the work itself.

As to the individual counts of the amended complaint, summary judgment will not be granted as to Counts VI and XI, since they relate directly to the alleged negligence [*22] of Lurgan and C&D. If a jury were to find that Lurgan and C&D engaged in an abnormally dangerous activity, the peculiar risk doctrine would apply, as set forth in § 427A. As to Count VIII, nuisance, and Count IX, trespass, the peculiar risk doctrine (or, more properly, a corollary of the doctrine) applies, pursuant to Restatement (2d) of Torts § 427B. n6

> n6 Neither § 427A nor § 427B have specifically been adopted as law by the Pennsylvania courts. However, at least three federal court opinions have been to the effect that a Pennsylvania court would apply § 427B. *Piccolini v. Simon's Wrecking, 686 F. Supp. 1063, 1070 n. 1 (M.D. Pa. 1988); McQuilken v. A & R Development Corp., 576 F. Supp. 1023, 1033 (E.D. Pa. 1983); City of Philadelphia v. Stepan Chemical Co., 544 F. Supp. 1135, 1152 n. 33 (E.D. Pa. 1982).* See also *Curry Coal Co. v. Arnoni Co., 439 Pa. 114, 266 A.2d 678, 681 (Pa. 1970)* (discussing, though not explicitly adopting, § 427B). We agree with those federal courts that § 427B would be applied in a Pennsylvania court, and, for the same reasons as expressed, hold that § 427A would be applied by the Pennsylvania courts.

[*23]

However, nothing about the peculiar risk doctrine indicates that it applies to intentional torts, such as Count X, intentional infliction of emotional distress. In fact, if the independent contractor commits an intentional tort, by the very term, that conduct would not be "inherent in the work" for which there is a contract, and intentionally tortious conduct is not foreseeable by the employer. Summary judgment in favor of Nassau is appropriate as to Count X.

### B. AT&T's Liability

Regarding the potential liability of AT&T for the conduct of Lurgan and C&D, through Nassau, the facts recited above indicate that the principle of respondeat superior does not apply, as AT&T did not direct or control the activities of Nassau in such a manner as to create an employer/employee relationship. Moreover, AT&T did not contract with Nassau to perform the activity at the site, so that the peculiar risk doctrine does

not apply. Therefore, AT&T can be liable for the activity at the site (to the extent of Nassau's liability) only if Nassau is the alter ego of AT&T.

As the statement of material facts indicates, there is not sufficient evidence relevant to the B.D.W. Associates factors [*24] upon which a jury reasonably could find that Nassau is the alter ego of AT&T. Although plaintiffs insist that this lack of evidence is due to the court's insistence on overly restrictive discovery limitations, the fact is that plaintiffs had the opportunity to conduct discovery as long as their inquiry was focused on the issues of the case and not a "fishing expedition." Plaintiffs chose not to take advantage of the discovery that was available (although, in fact, a massive amount of documentation was provided to plaintiffs). The result is that there is no evidence to support the alter ego theory espoused by plaintiffs, no more than there is evidence to support their conspiracy theory. Summary judgment will be granted in favor of AT&T on Counts VI through XI, inclusive, and those counts will be dismissed.

***The motion for summary judgment on the issue of **vicarious liability** will be granted in part and denied in part. An appropriate order shall issue.

James F. McClure, Jr.

United States District Judge

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. The motion (record document no. 418) for partial summary judgment filed by defendants AT&T Nassau [*25] Metals Corp. and American Telephone and Telegraph Co., is granted in part and denied in part.

(a) The motion for summary judgment in favor of Nassau is denied as to Counts VI, VII, VIII, IX, and XI of the amended complaint.

(b) The motion for summary judgment in favor of Nassau is granted as to Count X of the amended complaint.

(c) The motion for summary judgment in favor of AT&T is granted as to Counts VI through XI, inclusive, of the amended complaint, and those counts are dismissed.

2. Our order of March 1, 1994, concerning filing of documents and contact with the court remains in effect pending further order of court.

James F. McClure, Jr.

United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving a copy of the foregoing Brief of Defendant Keystone Oncology, LLC to Dismiss Plaintiffs' Claim Asserting Vicarious Liability for the Negligence of Defendant William Ying upon the person(s) and in the manner indicated below, which service satisfies the requirements of FRCP 5(b), by hand delivery, addressed as follows:

Richard Oare, Esquire
1434 South George Street
York, PA 17403
*(Counsel for Plaintiffs)*

Louis G. Close, III, Esquire
22 West Pennsylvania Avenue
Towson, MD 21204
*(Co-Counsel for Plaintiffs)*

Joseph A. Ricci, Esquire
Farrell & Ricci
4423 North Front Street
Harrisburg, PA 17110
*(Counsel for William Ying, Ph.D., Comprehensive Physics and Regulatory Services, Ltd.)*

McKissock & Hoffman, P.C.

By: _____
B. Craig Black, Esquire
2040 Linglestown Road
Suite 302
Harrisburg, PA 17110
(717) 540-3400

Attorneys for Defendants, David J. Salinger, M.D. and Keystone Oncology, LLC

Dated:_____